UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No.:09-cr-10183-GAO |
| | ) | |
| | ) | |
| DEREK CATALANO | ) | |
| | ) | |

**MOTION FOR NEW TRIAL AND/OR TO VACATE PURSUANT TO 28 U.S.C. §2255 AND INCORPORATED MEMORANDUM OF LAW**

Now comes Derek Catalano, the defendant in the above-captioned matter, pursuant to Fed.R.Crim.P. 33 and/or 28 U.S.C. §2255, and hereby moves the Court for an order granting a new trial regarding his cocaine conviction, and/or an order vacating his cocaine-related conviction and/or sentence in the above-captioned matter, as newly discovered evidence regarding misconduct at the Hinton Drug Laboratory warrant a new trial, and/or have resulted in a violation of Mr. Catalano's constitutional rights, including but not limited to his Fifth Amendment right to due process of law, given that his conviction and/or sentence were materially impacted by the misconduct that occurred at the Hinton Drug Laboratory, thus rendering his conviction and/or sentence constitutionally deficient, *see United States v. Noriega-Millan*, 110 F.3d 162, 166 (1st Cir. 1997) (plea must be knowing, intelligent and voluntary); *Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006); *Mateo v. United States*, 398 F.3d 126 (1st Cir.2005) (sentence improperly enhanced based on vacated, invalid state conviction could be attacked and corrected pursuant to §2255); *Brady v. Maryland*, 373 U.S. 83 (1963) (government must disclose favorable evidence material to guilt or punishment).

1

As grounds and reasons in support hereof, Mr. Catalano relies upon and incorporates the memorandum of law set forth below, as well as all exhibits filed in support hereof.[1]

**Memorandum of Law**

I. **RELEVANT BACKGROUND.**

In late 2008 or early 2009, federal agents began investigating a group of individuals suspected of trafficking oxycodone pills from Florida to Massachusetts, which ultimately led them to Catalano, who was suspected of being an end-distributor in Massachusetts. In May 2009, law enforcement officers secured a warrant to search, among other places, Mr. Catalano's business, D & C Specialty Detailing. At the same time, officers traveled to Catalano's residence, interviewed him, and sought consent to search his private residence. Catalano refused to consent to a search of his home, and officers thereafter secured a state warrant, ultimately seizing what the government alleged to be 603 grams of cocaine. While originally charged in state district court, on June 17, 2009, a federal grand jury returned an indictment charging Catalano with conspiracy to possess with intent distribute Oxycodone, in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute at least 500 Grams of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) (Count 4).

According to the government's production of discovery in this case, on May 22, 2009, the alleged cocaine was submitted to the Hinton Laboratory in Jamaica Plain, Massachusetts for testing. On June 15, 2009, a preliminary test was allegedly performed on the substance. That same day, an affidavit was purportedly signed by Assistant Analyst Charles Salemi, ostensibly certifying that the preliminary test had indicated that the substance was cocaine. Preliminary

---

[1] Mr. Catalano respectfully reserves the right to supplement this motion at a later date, including but not limited to additional facts that are discovered about Ms. Dookhan's misconduct and the conduct of others at the laboratory.

Certificate attached hereto as Exhibit 1.  A second test of the substance was allegedly conducted on June 17, 2009, and again, an affidavit was purportedly signed by Assistant Analysts Charles Salemi and Annie Dookhan, ostensibly certifying that the substance tested positive for cocaine. Certificate attached hereto as Exhibit 2.

On January 21, 2011, Catalano pleaded guilty to both counts, and he was sentenced on February 8, 2012.  Sentencing Transcript attached hereto as Exhibit 12.  At his sentencing, Catalano argued that he deserved a reduction based on his minimal role in the conspiracy.  The government opposed this request, in part arguing that Catalano had been involved in his own "separate ongoing drug activity relating to the cocaine, which," the government argued "…in some ways ma[de] him more culpable than the other defendants."  Sent. Tr. at 7.  The Court granted a reduction for minimal role, resulting in an offense level of 25, as calculated by the Court, and an advisory guideline range of 63 to 78 months.  The Court then turned to sentencing, and the government argued that a sentence of 78 months was appropriate given Catalano's alleged role in cocaine distribution, arguing that "… because none of the other defendants w[ere] involved with the cocaine that it seems self-apparent that [Catalano] should be… higher than the 63 months because that wouldn't take into consideration both the cocaine… and the oxycodone pills…, otherwise there's no penalty for having been involved with both." Sent. Tr. at 14-15.  In the end, government counsel argued Catalano should be sentenced at the high end of the guidelines (78 months) in part because it would take into account the cocaine.  Sent. Tr. at 16-17.

The Court ultimately agreed with the government, and sentenced Catalano to the high end of the guideline range.  In reaching its final decision, the Court relied on the additional cocaine charge, noting that it thought "the high end is an appropriate place because of the unrelated and serious cocaine offenses...."  Sent. Tr. at 21.  The Court also noted that it thought "an adjustment

of 15 months on account of that offense [cocaine offense], it's not a trivial amount of cocaine, so I think an adjustment of 15 months is appropriate." *Id*.

## II.   MISCONDUCT AT THE HINTON LABORATORY.

When he agreed to plead guilty, Catalano was of course completely unaware of all of the misconduct that had been ongoing, during all times pertinent to this case, at the Massachusetts Department of Public Health's ("MDPH") William A. Hinton Laboratory ("Hinton Lab," "Hinton Laboratory," and/or "the lab").  On August 30, 2012, approximately six months after Catalano was sentenced, the Hinton Lab was abruptly closed after investigation revealed that Annie Dookhan, the lab's most prolific chemist, engaged in widespread official misconduct which compromised the validity of thousands of drug test results.   Dookhan has since been charged with twenty-nine state crimes, including perjury, obstruction of justice, tampering with evidence, and falsely claiming to hold a degree.   Indictments attached hereto as Exhibit 3.   Shortly after the lab closed, Dookhan's immediate superior was fired and both the lab's director and the Commissioner of Public Health were forced to resign.   *See* Exhibits 4, 5.   Governor Patrick ordered a "file-by-file" review of every case Dookhan handled, and assigned Inspector General Glenn Cunha to conduct a comprehensive review of the lab.   *See* Exhibits 6, 7.   These investigations are ongoing.   It was recently reported that more than 40,000 cases may have been impacted by the misconduct.   Exhibit 11.   The lab remains closed and the remaining analysts are on administrative leave and have not been allowed to resume testing duties.

### A.   Background of the Hinton Drug Lab Scandal.

In June 2011, Annie Dookhan's immediate superiors discovered that she had accessed the evidence safe without authorization, removed 90 drug samples, and subsequently forged a co-worker's initials on the evidence log after the breach was discovered.   Dookhan's superiors did

4

not report her misconduct to the MDPH Commissioner's Office or General Counsel for almost six months, due to their perception that Dookhan was a high-achieving, reliable employee and that this was an isolated incident.[2] Instead, Dookhan was allowed to finish her outstanding tests, then removed from testing duties and assigned to write protocols for the laboratory.

MDPH General Counsel first learned of Dookhan's misconduct in December 2011 during planning meetings in preparation for the previously-scheduled transfer of the forensic drug laboratory to the State Police Crime Laboratory.[3] At that point, MDPH conducted a limited internal investigation into the incident, which concluded that Dookhan "failed to follow laboratory protocols for the transfer of samples and subsequently created a false record of the transfers."[4] Beginning February 1, 2012, Linda Han, MDPH's Bureau of Laboratory Sciences Director, sent letters to prosecutorial agencies associated with the 90 samples about Dookhan's breach and her subsequent falsification of logs.[5] Dookhan was placed on administrative leave of absence on February 21, 2012 and formally terminated as of March 9, 2012.[6] In August 2012, EOPSS and the Attorney General began their own criminal investigation of Dookhan, which quickly resulted in the lab's closure.

---

[2] *See* Exhibit 8 at 337-338 (references are to bate-stamped numbers on bottom right of documents).
[3] Exhibit 8 at 337. The functions and personnel of the Hinton forensic drug lab were to be transferred to the Executive Office of Public Safety and Security ("EOPSS") and become part of the State Police Crime Laboratory effective July 1, 2013. As staff on the proposed transfer list were reviewed, Dookhan's immediate superiors shared information about her misconduct with MDPH and identified Dookhan as someone who would not be part of the transfer.
[4] Exhibit 8 at 338.
[5] Exhibit 9.
[6] Exhibit 8 at 339.

**B. Dookhan's Misconduct.**

To date, several thousand pages of discovery have been produced regarding Dookhan and the lab.[7] In broad strokes, the discovery reveals that, among other things, Dookhan:

a) admitted to law enforcement that for several years, she had been "dry-labbing" (*i.e.*, simply certifying, without testing, that the substance was the suspected drug);

b) admitted that she laid out samples from different cases on her bench at the same time and grouped them by the type of suspected drug. This allowed for cross-contamination as well as compromising the chain of custody;

c) admitted that she "batched" samples together and tested some but not others, then simply labeled the others as the drug she suspected it of being;

d) Admitted that when the gas chromatograph/mass spectrometer ("GC/MS") machine did not confirm her "result," she would intentionally contaminate the sample by using a known drug from a completed test, which she stored at her bench;

e) had a key to the evidence safe;[8]

f) admitted that she had access to the evidence database;[9]

g) admitted that when she was discovered in possession of 90 drug samples that were not properly signed out to her, she falsified an evidence officer's initials in the evidence log book;

h) admitted that she falsified other chemists' initials on quality control documents for the GC/MS machine;

i) failed to properly run the quality control test samples for the GC/MS machine, and instead falsely certified that she had done so;

j) failed to properly calibrate balances, which are used to ensure the accuracy of the drug weights measured by the chemist;

k) communicated directly with prosecutors about specific cases, and displayed a prosecutorial bias.

l) falsely stated on her curriculum vitae that she had received a Master of Science in Chemistry from the University of Massachusetts; and

---

[7] The United States Attorney's Office has transmitted discovery produced by the Massachusetts Office of the Attorney General. Rather than inundate the Court with exhibits, Catalano will provide discovery documents to the Court to the extent any facts are disputed by the government, or if the Court requests any discovery documents.

[8] Investigators determined that Dookhan's key opened the evidence safe, and that supervisors did not replace the safe's lock until December 2011, six months after her initial misconduct was discovered in June 2011.

[9] A computerized database apparently kept a record of samples that were submitted to the lab. When a sample was signed out to a chemist for testing, a record of the transfer was recorded in both the database and a separate logbook stored in the evidence office. When a chemist returned samples after testing this was apparently documented in both the database and the logbook (Exh. 8 at 334-335).

m) falsely testified under oath on a number of occasions.

The laboratory's internal statistics revealed that Dookhan's testing volume was vastly out of proportion with the other chemists. In 2004, the first full year she was on the job, Dookhan tested 9,239 samples, while the next most productive chemist tested only 6,262 samples (Exh. 8 at 342). In 2005, she tested 11,232 samples, and the next most productive chemist tested only 6,053 samples (*Id.*). One chemist told investigators that while most chemists were testing 50 to 150 samples per month, Dookhan was testing over 500 samples per month, but that there were not enough slides in her discard pile to correspond with those high numbers. Another noted that he never saw her in front of a microscope, although that is how the chemists performed micro-crystal tests on cocaine samples. Although the productivity of the other lab chemists decreased after the Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) because of time spent on court appearances, Dookhan's productivity actually increased. In 2010, Dookhan tested 10,933 samples while the second most prolific chemist tested 3,839 (Exh. 8 at 342). In total, Dookhan was responsible for 25% of the laboratory's total analyses and completed 21.8% of all tests conducted by staff (Exh. 8 at 341-342). Given the lack of adequate documentation and quality control procedures at the laboratory, the true scope of Dookhan's misconduct may never be fully known. Throughout her tenure at the lab, Dookhan had unfettered access to evidence—her key opened the evidence safe, and she had access to the evidence database.[10] She had unrestricted access to drug "standards" (known samples of particular drugs used in the CG/MS machine for

---

[10] Dookhan admitted to law enforcement that she had access to the evidence database. Co-workers also reported that Dookhan could access the database. Dookhan was also seen going into the safe alone, giving out samples, and entering data on the evidence computer. It is presently unknown whether Dookhan accessed the evidence safe on other occasions and altered the database to hide her conduct.

comparison).[11]  Moreover, Dookhan's access to the laboratory, safe, and the database continued even after she was removed from testing duties in June 2011.[12]

        **C.**        **Lack of Quality Control At the Laboratory**.

The Inspector General is currently conducting a comprehensive review of the laboratory in general, and a report is expected to be released later this year.  MDPH's own internal review, conducted in the wake of the lab's closure, found a number of "vulnerabilities" at the lab, including lack of accreditation, insufficient quality control oversight, outdated and vague protocols, insufficient safeguards on access to the evidence room and safe, absence of camera surveillance, lack of a mechanism to track chemists' discrepancies or adverse results, and lack of close supervision from supervisors (Exh. 8).  Accreditation would have required standards for training, personnel, equipment and instrumentation, and would also have required chemists to keep more detailed data regarding the testing process (Exh. 8 at 333).  However MDPH purportedly lacked the funds necessary to pursue accreditation. *Id.* The protocols that the lab did have in place were both outdated and too generalized "to guarantee[] the type of integrity needed to deliver high-quality forensic drug analyses." (*Id.* at 332-333).  In addition, in 2008 budget cuts had forced MDPH to eliminate their quality control division, which oversaw all 18 MDPH laboratories within the Bureau of Laboratory Sciences, and to decentralize the quality control function to each individual laboratory (*Id.* at 333).  Essentially, these laboratories, including the forensic lab at issue here, were left to police themselves.  Ironically, Dookhan herself had quality control responsibilities at the lab.

---

[11] Part of Dookhan's responsibilities at the lab was to prepare vials of these "standard" drugs for use in the CG/MS machine.

[12] Dookhan admitted to law enforcement that she continued to access the evidence database after being removed from testing duties. She also apparently boasted to a state court prosecutor in an email in November 2011 that "I have access to anything and everything."

The laboratory's documentation procedures were so poor that potentially exculpatory data was not disclosed to either prosecutors or defense attorneys on a regular basis. The laboratory did not maintain an adverse events log. Thus they did not have a mechanism in place to capture instances where secondary GC/MS testing failed to confirm a primary chemist's conclusion. In those instances, the confirmatory chemist would return the sample to the primary chemist for the primary chemist to "resolve the discrepancy" (Exh. 8 at 341). Dookhan has admitted to resolving her discrepancies by contaminating evidence. There was no procedure in place to reconcile or even compare the data of a second run of a sample on the CG/MS machine with the first, to ensure the results of the second run were accurate. The only place that a discrepancy between the primary chemist's result and confirmatory CG/MS testing might be noted was on the back of an index card known at the "control card." However, the chemists, who typically provided discovery to the prosecuting attorneys on their own cases, apparently only transmitted the *fronts* of the control cards in the discovery packet. Thus, any discrepancy would presumably be unknown to both the prosecutor and, in turn, to the defense attorney.

The lack of evidentiary integrity is further evidenced by the fact that the lab supervisor later discovered that a number of chemists' keys, not just Dookhan's, opened the safe door, despite the fact that only evidence officers were authorized to access the safe, as well as the fact that after the lab's closure investigators found drug samples scattered about the lab, including in desk drawers, taped to lab cabinets, and even within boxes of files the Attorney General sent for scanning. Finally, it is clear that oversight and supervision were practically non-existent, as demonstrated by the lab supervisors' failure to monitor Dookhan's unusually high volume of testing (Exh. 8 at 341-342); failure to respond appropriately to information that she falsified coworkers' initials on quality control documents; failure to report Dookhan's breach of the evidence safe and

falsification of logs to the MDPH Commissioner's Office for six months (Exh. 8 at 336-339, 343); and failure to safeguard the evidence safe until six months after the breach. The Hinton laboratory's vulnerabilities were systemic and pervasive and compromised the reliability of all its test results.

## III. GROUNDS FOR RELIEF.

### A. DEFENDANT'S CONVICTION AND/OR SENTENCE SHOULD BE VACATED UNDER 28 U.S.C. § 2255 BECAUSE THEY ARE CONSTITUTIONALLY DEFICIENT GIVEN RECENT EVIDENCE OF MISCONDUCT AT HINTON LABORATORY

A prisoner may move a court to vacate or set aside his conviction and/or sentence under 28 U.S.C. § 2255 where he is in custody under sentence of a court established by Act of Congress, and claims that the sentence was imposed in violation of the Constitution or laws of the United States. 28 U.S.C. § 2255; *United States v. Colon-Torres*, 382 F.3d 76, 85, n. 8 (1st Cir. 2004). Likewise, Fed. R. Crim. P. 11(e) provides that a guilty plea may be set aside under 28 U.S.C. § 2255 ("After the court imposes sentence, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack.").

Because a defendant who enters a guilty plea "simultaneously waives several constitutional rights," *McCarthy v. United States*, 394 U.S. 459, 466, (1969) due process requires that the defendant's entry of a guilty plea be a voluntary, knowing, and intelligent act, "done with sufficient awareness of the relevant circumstances and likely consequences." *United States v. Noriega-Millan*, 110 F.3d 162, 166 (1st Cir. 1997).

In addition, "because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy*, 394 U.S. at 466. In *McCarthy v. United States*, 394 U.S. 459,

466, (1969), the Court explained that, aside from directing the judge to inquire into the defendant's understanding of the nature of the charge and the consequences of his plea, Rule 11 also requires the judge to satisfy himself that there is a factual basis for the plea. *Id.* at 467.

A guilty plea is involuntary if induced by misrepresentation. *Brady v. United States*, 397 U.S. 742, 755 (1970). Citing *Brady*, the First Circuit has held that a guilty plea is involuntary where (1) the government or its agents committed some egregiously impermissible conduct that antedated the entry of the plea; and (2) the misconduct was material to the defendant's choice to plead guilty. *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006). In analyzing whether the misconduct was material to the defendant's choice to plead guilty, a court must determine whether there is a "reasonable probability the defendant would not have pleaded guilty" had he known about the misconduct. *Id.* at 294. It is clear that a defendant is not entitled to change his guilty plea simply because he miscalculated the strength of the case against him. *See Brady v. United States*, 397 U.S. 742,757 (1970). However, when that miscalculation is the result of "some particularly pernicious form of impermissible conduct[,] ... due process concerns are implicated." *Ferrara*, 456 F.3d at 291.

Here, Dookhan was clearly a government agent, as the government relied upon her work product in preparing and prosecuting this case, and the Hinton laboratory was required by statute to perform chemical analyses of drugs upon request from law enforcement agencies.[13] *See* M.G.L. c 111 §§12-13. Her conduct antedated Mr. Catalano's guilty plea, and it cannot be fairly characterized as anything but egregious. *See Ferrara*, 456 F.3d at 290 ("egregiously impermissible

---

[13] In vacating guilty pleas on the due process grounds articulated in *Ferrara*, Massachusetts courts have found that chemists were agents of the government on the basis of evidence concerning their role at the Hinton Drug Lab. *See Commonwealth v. Rodriguez*, No. 2007-00875, 2013 WL 2420416 at *3 n. 5 (Mass. Super. May 29, 2013); *Commonwealth v. Baez-Franco*, No. 2009-01151, slip. op. at 6 (Mass Super. April 25, 2013).

conduct" encompasses threats, blatant misrepresentations or untoward blandishments by government agents); *Brady v. United States*, 397 U.S. at 755; *but see United States v. Wilkins*, 2013 WL 1899614 (D.Mass. May 8, 2012) (Stearns, J.) (finding that Dookhan's misconduct did not rise to the level of the egregious misconduct in *Ferrara*, which involved coercion "compromis[ing] . . . a claim of factual innocence").[14] Finally, certainly there exists a "reasonable probability the defendant would not have pleaded guilty" had he known about the misconduct. *Ferrara*, 456 F.3d at 294. The scope and extent of Dookhan's misconduct is astounding, and certainly provides a defendant with a solid basis to proceed to trial in any case in which she was involved. While the full extent of misconduct remains unknown, to date it has been determined that she (1) admitted that for several years she had been "dry-labbing" (*i.e.*, simply certifying, without testing, that the substance was the suspected drug), (2) admitted that she laid out samples from different cases on her bench at the same time and grouped them by the type of suspected drug, which allowed for cross-contamination as well as compromising the chain of custody, (3) admitted that she "batched" samples together and tested some but not others, then simply labeled the others as the drug she suspected it of being, (4) admitted that when the gas chromatograph/mass spectrometer machine did not confirm her "result," she would intentionally contaminate the sample by using a known drug from a completed test, which she stored at her bench, (5) possessed a key to the evidence safe, thus providing access to drugs, (6) admitted

---

[14] The Court in *Wilkins* has subsequently granted a Certificate of Appealability, saying that although "the conduct of the government cannot fairly be compared with the blatant wrongdoing in *Ferrara*, and while there is no claim by Wilkins of actual innocence, a reasonable jurist might well disagree with this court and find that prophylactic considerations merit a granting of Wilkins petition to withdraw his guilty plea." *Wilkins*, No. 11-10217, Memorandum and Order on Application for Certificate of Appealability, June 6, 2013.

falsifying other chemists' initials, and (7) falsely testified under oath on a number of occasions.

Because each defendant's decision whether to enter a guilty plea is "personal and, thus, unique," the First Circuit has said that no checklist of factors bearing on the reasonable probability that a defendant would have elected to go to trial can be determinative. *Ferrara*, 456 F.3d at 294. As a general matter, however, it noted that "nondisclosure of powerful impeachment evidence" is "apt to skew the decisionmaking of a defendant who is pondering whether to accept a plea agreement." *Id.* at 296. Moreover, if the evidence substantially detracts from the factual basis of the plea, or if knowledge of the evidence would have prompted defense counsel to seek a better plea bargain, there is support for the reasonable probability that the defendant would have elected to go to trial. *Id.*

Surely, there exists a "reasonable probability" that Mr. Catalano would not have pleaded guilty to the cocaine offense had he been armed with vast array of information regarding the misconduct at the Hinton Lab. *See Ferrara*, 456 F.3d at 293 (in analyzing whether information is material to the defendant's choice to plead guilty, a court "considers whether a reasonable defendant standing in the [defendant's] shoes would likely have altered his decision to plead guilty ..." had he known about the misconduct). Accuracy of drug testing is critical in a drug prosecution. Each drug certification states "that the contents [of the certification] are truthful and accurate to the best of . . . the affiant's . . . knowledge and belief." The replication of G.L. c. 111, § 13 on each certificate states:

> This [drug analysis] certificate shall be sworn to before a Justice of the Peace or Notary Public, and the jurat shall contain a statement that the subscriber is the analyst or assistant analyst of the department. When properly executed, it shall be prima facie evidence of the composition, quality, and the net weight of the narcotic or other drug, poison, medicine, or chemical analyzed, and the court shall take

13

> judicial notice of the signature of the analyst or assistant analyst, and of the fact that he/she is such.

*Ferrara* prejudice is met here where the information about Dookhan's misconduct is powerful impeachment evidence which could have resulted in a better plea deal, or could have supported a decision to go to trial, because it severely undercut the validity of drug certifications used to establish an element of the offense, materially impacted the chain of custody, and would raise the serious possibility that the drugs allegedly seized from Catalano's residence had been intentionally contaminated by Dookhan (or others). *Cf. Commonwealth v. Baez-Franco*, *supra* at 12-13 (vacating plea where the defendant and counsel should have had the information about Dookhan's misconduct to inform them as to what kind of plea bargain to seek and/or accept or whether to reject a plea bargain and go to trial); *Commonwealth v. Rodriguez*, 2013 WL 2420416 at *4 (second prong of *Ferrara* satisfied where "the evidence of Ms. Dookhan's misconduct calls into question not only Ms. Dookhan's credibility as a witness, but also the reliability of the drug certificate itself, thereby potentially jeopardizing the Commonwealth's ability to meet its burden at trial of proving beyond a reasonable doubt that the substance is a particular drug). As reflected in the affidavit attached hereto as Exhibit 10, Mr. Catalano has asserted that he would not have pleaded guilty to the cocaine related offense had he been apprised of the existence and scope of Dookhan's misconduct.

*Ferrara* prejudice is not defeated here by the possibility that independent retesting of samples seized from defendants could provide evidence that they possessed and sold cocaine. Although the court in *Wilkins* relied heavily on the possibility of independent retesting of the remaining plastic bags contained within the samples in finding *Ferrara* prejudice unmet (*Wilkins*

14

at 18), any retesting of samples initially delivered to the Hinton Lab must be regarded as highly suspect. Dookhan's specific admission that she "routinely" laid out multiple samples from different cases on her bench and grouped them together according to the type of suspected drug undermines any claim that any portion of a sample she handled retained its integrity. Given her admission, there can be no assurance that drugs that were collected by law enforcement in a specific case are the same drugs available for retesting.[15] In addition, Dookhan's access to both the safe and the evidence database ensured that she had access to any sample, even those not specifically assigned to her.

Moreover, the Hinton Lab itself is the subject of a forensic investigation being conducted by Massachusetts Inspector General Glenn Cunha. Periodic releases of discovery by the Massachusetts Attorney General's Office have indicated that the laboratory lacked any type of independent accreditation, maintained outdated operating procedures, and lacked any independent and meaningful quality assurance or quality control procedures. There were insufficient safeguards on access to the evidence room, safe, and the evidence database. A number of chemists keys opened the evidence safe. In addition, recent discovery indicates that drugs were found scattered throughout the lab, including on the floor, in desk drawers and filing cabinets, and within files that were sent by the Inspector General for scanning by an independent vendor. A

---

[15] Drugs such as cocaine and heroin are often packaged in multiple, small baggies. A police officer collecting such evidence and documenting chain of custody would not typically initial each small baggie, but instead group them into a larger heat-sealed bag and label the outside of that larger bag. Unless each individual baggie was labeled by the individual who collected it, there can be no assurance that the drugs that passed through Dookhan's hands are the same drugs submitted to the laboratory under that specific sample number, given Dookhan's admission that she opened evidence bags from multiple cases simultaneously and intermingled the evidence on her work bench. Other discovery also supported Dookhan's statement that she mixed bags from multiple cases.

15

large amount of what appeared to be marijuana and other miscellaneous samples were found, not secured in the evidence safe, but in a cabinet. Protocols did not limit a chemist to removing and analyzing samples from a single case and returning them to the evidence safe before removing and analyzing samples from another case. The danger of even inadvertent cross-contamination from the fact that a chemist could have samples from any number of cases at his/her workstation at any one time suggests that the chain of custody vital to the evidentiary integrity of any retesting has been severely, if not fatally, compromised. The availability of independent retesting of samples that have been in the Hinton Laboratory should not be a basis for determining that there is no reasonable probability that a defendant who plead guilty would have opted to go to trial.

Lastly, and alternatively, the aforementioned evidence of blatant misconduct warrants the resentencing of Catalano, even if not the vacating of his conviction. In *Mateo v. United States*, 398 F.3d 126 (1st Cir.2005), the First Circuit held that the vacating of a state court conviction rendered Mateo's federal sentence subject to correction under §2255 insofar as it was enhanced by the state conviction. Here, the court enhanced Catalano's sentence explicitly based upon allegations he was involved in cocaine distribution, which was inexorably linked to testing performed by Dookhan. As such, for all the foregoing reasons, it was error to increase Catalano's sentence based on the cocaine-related allegations, given the inherent unreliability of any testing performed on the substance, the fact that Catalano's plea to that offense is constitutionally deficient, and/or enhancing a sentence based upon evidence tethered to Dookhan amounts to a fundamental defect which inherently results in a complete miscarriage of justice. *See Mateo*, 398 F.3d at 136; *Hill v. United States*, 368 U.S. 424, 428 (1962).

**B. THE FAILURE TO DISCLOSE THE MISCONDUCT AT THE HINTON LAB POTENTIALLY VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS UNDER *BRADY V. MARYLAND.***

*Brady v. Maryland* 373 U.S. 83 (1963) requires a prosecutor to learn of and disclose any exculpatory or impeachment evidence known to other government agents who are acting on the government's behalf. *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). Failure to do so violates due process. *Brady*, 373 U.S at 87.

Where evidence is wrongly withheld in violation of *Brady*, the defendant must show:

(1) the evidence at issue is material and favorable to the accused; (2) the evidence was suppressed by the prosecution; and (3) the defendant was prejudiced by the suppression in that there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

*Strickler v. Greene*, 527 U.S. 263, 280 (1999).

Suppression for *Brady* purposes occurs even when the government fails to turn over evidence known only to investigators and not to the prosecutor. *See Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006). Here, the government relied upon testing conducted by Dookhan, thus rendering her an "agent" of the government. *See, e.g.*, Guidance for Prosecutors Regarding Criminal Discovery, issued January 4, 2010 by Deputy Attorney General David W. Ogden (the "Ogden Memo"), U.S.A.M. 9-5.001(Prosecution team members include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant); *Commonwealth v. Woodward*, 427 Mass. 659, 679 (1998) (similarly situated professional is a "government agent" and a member of the "prosecution team").

Where the defendant entered a guilty plea, the showing of prejudice from the withheld

17

evidence is that "there is a reasonable probability that but for the withholding of the information [he] would not have entered the guilty plea but would have insisted on going to a full trial." *Ferrara v. United States*, 384 F.Supp. 2d 384, 421 (D. Mass. 2005), *quoting Miller v. Angliker*, 848 F.2d 1312, 1322 (2d Cir. 1988)) *aff'd on other grounds*, 456 F.3d 278 (1st Cir. 2006).

The due process right described in *Brady v. Maryland* is applicable in this plea context. The district court in *Ferrara* found the right applicable in the plea context. Though the Supreme Court in *United States v. Ruiz*, 536 U.S. 622 (2002) earlier held that the government need not disclose impeachment information prior to entering into a plea agreement with a defendant, the information at issue here went beyond impeachment. Here the information withheld concerned the validity of drug certificates issued by Annie Dookhan attesting to whether seized substances were in fact drugs and the weight of the substances. This information goes directly to an element of the drug conviction. *Cf. Commonwealth v. Baez-Franco*, *supra* at 13 (Although evidence of Dookhan's misconduct could certainly have been used to impeach her credibility . . . it can hardly be said that this evidence is merely impeaching); *Commonwealth v. Rodriguez*, 2013 WL 2420416 at *4 (noting that the evidence of Dookhan's misconduct "calls into question not only Ms. Dookhan's credibility as a witness, but also the reliability of the drug certificate itself . . . .").

Here, Catalano did not receive any information concerning the misconduct of chemists working at the state drug lab who produced the drug certificate(s) in his case. As such, the validity of Catalano's conviction and sentence have potentially been fatally infected by *Brady* error, and further discovery on this issue is warranted.

### C. A NEW TRIAL IS WARRANTED PURSUANT TO RULE 33.

In *United States v. Mathur*, 624 F.3d 498, 503-04 (1st Cir.2010), the First Circuit reviewed

the standards for obtaining a new trial based on newly discovered evidence:

> To gain a new trial based on newly discovered evidence, a defendant normally must pass a four-part test: he must show that (i) the evidence in question was unknown or unavailable to him at the time of trial; (ii) his failure to learn of it did not result from a lack of due diligence on his part; (iii) the evidence is material; and (iv) the evidence, if available upon retrial, would likely bring about an acquittal. *United States v. Huddleston*, 194 F.3d 214, 218 (1st Cir.1999); *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir.1980). When, however, a criminal defendant's new trial motion is premised on the belated disclosure of evidence that should have been made available to him in accordance with the imperatives of *Brady*, a somewhat less formidable standard applies.
>
> To obtain the benefit of this more defendant-friendly paradigm, a defendant must make three showings. "The evidence at issue (whether exculpatory or impeaching) must be favorable to the accused; that evidence must have been either willfully or inadvertently suppressed by the government; and prejudice must have ensued." *United States v. Connolly*, 504 F.3d 2016, 212 (1st Cir.2007) (*citing Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The first two showings are comparable to the first two requirements of the *Wright* test.
>
> The difference between the two standards lies in the replacement of the last two requirements of the *Wright* test "with the unitary requirement that the defendant establish 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id*. at 213 (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985)). In this context, the Supreme Court has equated "reasonable probability" with something sufficient to "undermine[ ] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation omitted).
>
> We have noted two other refinements that distinguish the *Brady* new trial standard from the ordinary *Wright* standard. *See Connolly,* 504 F.3d at 213. First, the probability that a defendant must show does not have to be an "*actual* probability that the result would have differed"; it may be "a merely theoretical (but still reasonable) probability." *Id.* (emphasis in original). Second, "undisclosed impeachment evidence, if it suffices to undermine confidence in the outcome of the trial, may carry the day." *Id.* (*citing Bagley*, 473 U.S. at 682.

For all of the reasons previously discussed, a new trial on the cocaine related indictment is warranted, regardless of which standard is applied to the newly disclosed evidence.

## IV. CONCLUSION.

For all the foregoing reasons, Mr. Catalano respectfully requests that the court vacate his conviction and order a new trial and/or vacate his sentence; and further that the court allow Mr. Catalano to supplement this motion with additional material necessary to a full and informed finding by the Court, additional material uncovered by further investigation of the drug lab, and/or discovery received from the government.

                                              Respectfully Submitted,
                                              Derek Catalano,
                                              By His Attorney,

                                              **/s/ Robert M. Goldstein**
                                              Robert M. Goldstein, Esq
                                              Mass. Bar No. 630584
                                              20 Park Plaza, Suite 1000
                                              Boston, Massachusetts 02116
                                              Tel. (617) 742-9015
                                              Fax (617) 742-9016
                                              rmg@goldstein-lawfirm.com

Dated: August 29, 2013

## Certificate of Service

I, Robert M. Goldstein, hereby certify that on this date, August 29, 2013, a copy of the forgoing document has been served via CM/ECF Electronic Filing upon Assistant U.S. Attorney Linda M. Ricci and all other counsel of record.

                                              **/s/ Robert M. Goldstein**
                                              Robert M. Goldstein